**Elite KIRAY, Plaintiff–Appellant,**

v.

**HY–VEE, INC., and Eric Kearney, Defendants–Appellees.**

No. 04–1716.

Court of Appeals of Iowa.

March 29, 2006.

John S. Allen and Tanya Janulewicz, Student Legal Intern, Iowa City, for appellant.

Thad J. Collins and Terry J. Abernathy of Pickens, Barnes & Abernathy, Cedar Rapids, for appellees.

Heard by SACKETT, C.J., and VOGEL and MAHAN, JJ.

MAHAN, J.

Elite Kiray appeals the district court's judgment in her action for defamation, false imprisonment, and racial discrimination. She argues the district court erred when it (1) determined a qualified privilege applied to Hy–Vee, Inc. (Hy–Vee) employees' communications; (2) refused to grant her proposed jury instruction that control over a person's property can serve to restrain that person; (3) dismissed her discrimination claim; and (4) denied her claim based on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We affirm.

## I. Background Facts and Proceedings

Elite Kiray stopped at the Waterfront Hy–Vee in Iowa City sometime around 9:20 a.m. on May 17, 2001. She first deposited a check at the bank branch located just inside the store, then proceeded to shop for groceries. She purchased a whole catfish, dish soap, and bread. All of her groceries and her receipt were placed in a Hy–Vee bag. As Kiray proceeded to leave, however, the Sense–O–Matic security system gates located at the front of the store alerted. Though Kiray claims not to have heard the alarm, Hy–Vee Second Assistant Manager Eric Kearney and bank employee Leslie Raker did.

At the time of the incident, Hy–Vee was testing the Sense–O–Matic system to determine whether to install it in other stores. The system had had several false alarms. For example, it had alerted to items that had been purchased at Hy–Vee and failed to deactivate at the check-out, to employee I.D. badges, and to items from other stores that had not been deactivated such as shoes, purses, and other leather goods.

The facts that follow are somewhat disputed. According to Kiray, Kearney walked up behind her and grabbed her grocery bag. He then walked back toward the security gates, away from Kiray and the store's exit. He directed Kiray to walk through the gates with her purse. He asked Kiray for her purse, and then walked through the gates himself. He placed Kiray's purse on the bank's counter, then directed Kiray to walk through the gates with her grocery bag. He took the grocery bag, placed it on the bank's counter with the purse, and then directed Kiray to walk through the gates. Kearney then told Kiray to wait while he got another employee. Kiray stood by the gates upset and crying. Kearney returned with another Hy–Vee manager, Michelle Patterson. Patterson carried a hand-held scanner wand. She made Kiray remove her shoes to be scanned, then scanned her body. When the alarm did not alert, Patterson walked the grocery bag back through the security gates. The alarm on the gates went off. Patterson then deactivated the tag on the package of catfish. Kearney returned Kiray's groceries and apologized.

According to Kearney, after he heard the security alarm, he approached Kiray and asked her if there was something in her grocery bag Hy–Vee had failed to deactivate. He never believed she was shoplifting and therefore never accused her of shoplifting. He told Kiray it was not uncommon that an item would fail to deactivate, and that the catfish was the likely culprit. He asked her permission to move her grocery bag back through the gates. When the alarm did not sound, he assured her the same problem had happened before, and asked her permission to move her purse through the gates. When the alarm still did not sound, Kearney told Kiray her shoes or clothing might be activating the alarm. He asked her to walk through the gates without the groceries or her purse. The alarm alerted to Kiray. Because he could still could not find what was causing the alarm to falsely alert, he decided to use the scanner wand. In order to make Kiray more comfortable, he asked Patterson, a female manager, to use the wand. He asked Kiray if she was willing to wait while he retrieved Patterson, and she assented. At some point in her interaction with Kearney, Kiray told him she was not "like those other blacks that steal from [Hy–Vee], she was a Christian from Africa." Kearney never mentioned race.

While Kearney was locating Patterson, Raker, the bank employee who had waited on Kiray earlier that morning, approached Kiray and told her it was common for the alarms to sound. She explained the many innocent ways Kiray could have set off the alarm. She also explained that Hy–Vee was trying to find whatever had set off the alarm so she would not set off the alarm again at Hy–Vee or at other stores.

Patterson approached Kiray with the wand and asked her to remove her shoes. When the wand did not alert to Kiray's shoes or clothing, Patterson asked if she could take the grocery bag back through the gates. She explained that if the package was turned the wrong way, the gate might not alert. Kiray consented, and Patterson passed the bag back through the

gates. When the alarm sounded, Patterson found and deactivated the catfish package. She gave the groceries back to Kiray. She apologized to Kiray explaining that, like they thought, the problem had been Hy–Vee's. Kiray became very upset. Patterson apologized again. Kearney came back to apologize, and Kiray became emotional and left. At no time did Patterson believe or accuse Kiray of shoplifting. Nor did she mention Kiray's race.

According to Kiray, she returned to the store a few minutes later to get the name of the cashier whom she had paid for the groceries. Allen Dix, the Hy–Vee Store Director, asked Kiray what had happened. She told Dix she had been accused of stealing and that she did not steal like "those other black people." Dix observed Kiray was visibly upset, and told her that if she were that upset, "we probably didn't do our job correctly and we hadn't handled things right because our goal is not to have the customer leave the store that unhappy." Dix also apologized.

Kiray brought claims of battery, false imprisonment, defamation, and discrimination against Hy–Vee and Kearney. After jury voir dire, Kiray's counsel requested a hearing pursuant to *Batson v. Kentucky*. The following exchange occurred:

> Plaintiff's counsel: Your Honor, thank you. This is pursuant to *Batson v. Kentucky*. There were two African American jurors in the prospective panel. The Defendant struck both of those jurors. I think I don't need to hear any sort of explanation with respect to Ms. Davis.
>
> . . . .
>
> I don't have an issue with—I mean, I think I can understand, I don't need to hear an explanation with respect to Ms. Davis. But I think under *Batson*, when the only African American jurors go out on peremptory exercise by a party, there at least has to have some sort of a

showing what those bases were, and I didn't see any for Mr. Grant, frankly.

> Court: Mr. Abernathy?
>
> Defense counsel: Well, Mr. Grant started with [sic] was similar to the Plaintiff in this case in that he is not a born citizen in the United States. He also, in response to questions from Plaintiff's counsel, expressed a clear opinion that he did not think the expression equal justice under law that appears before the United States Supreme Court building applied universally in this country, which concerns me as to whether or not he would be fair and impartial.
>
> And Mr. Morgan, who also expressed the same concerns about equal justice, who is not a black party, was also one of my strikes. Those three people, because of their views of our justice system, not because of their race, creed, color, origin, or anything else were three of my four strikes. And my other strike, of course, was also a non-minority.
>
> Plaintiff's counsel: I would just observe that Mr. Chen, I think would have met some of those characteristics, I think he spontaneously offered a critique of—that there was equal justice under the law, although I recognize his views were a little more complex than that, so.
>
> Court: The court notes the record and finds that—and I heard the questioning as well and the response to not only the question to the lawyers and the rationale for the striking of those three witnesses. I guess, that have been discussed, only two of which are black. If Mr. Morgan is a minority, it's uncertain from his appearance, it's not clear, but he expressed some of the same feelings as expressed by the others, so the Court notes the objections under *Batson*, and it's overruled. Good enough.

During trial, the battery, false imprisonment, and defamation claims were tried to the jury; the discrimination claim was tried to the bench. The court determined that a qualified privilege applied to the Hy–Vee employees' communications with regard to the incident, and gave the jury the following instruction:

### Instruction No. 16

To establish her slander claim, Plaintiff must prove all of the following propositions:

1. The Defendants made the statements.

2. The Defendants communicated the statements to someone other than the Plaintiff.

3. The statements would reasonably be understood to be an expression which would attack a person's integrity or moral character.

4. The Defendants acted with knowing or reckless disregard of the truth of the statements.

If the Plaintiff has failed to prove any of these propositions, the Plaintiff is not entitled to damages. If the Plaintiff has proven all of the propositions, then the Plaintiff is entitled to damages in some amount.

With respect to the false imprisonment claim, the court gave the following instructions:

### Instruction No. 9

False Imprisonment is the unlawful restraint of an individual's personal liberty or freedom of movement.

The Plaintiff must prove all of the following propositions:

1. The Plaintiff was detained or restrained against her will.

2. The detention or restraint was done by the Defendants.

3. The detention or restraint was a proximate cause of Plaintiff's damage.

4. The amount of damage.

If the Plaintiff has failed to prove any of these propositions, the Plaintiff is not entitled to damages. If the Plaintiff has proved all of these propositions, the Plaintiff is entitled to damages in some amount.

### Instruction No. 10

Detention or restraint against one's will does not need to be accomplished by physical force or threats of physical force.

It is the fact of detention rather than its length that is relevant.

Kiray also proposed the following instruction:

False Imprisonment—Detention and Restraint—Defined: Physical force, or threats of physical force, are not necessary to prove detention or restraint against one's will.

The exercise of control over the property of a person by another can serve to restrain the person to whom the property belongs.

A customer can be restrained against his or her will when he or she submits to a store employee's asserted authority to search a bag or the person.

The court denied the instruction.

The jury found for Hy–Vee on the battery, false imprisonment, and defamations claims. The court granted Hy–Vee's motion to dismiss the discrimination claim. Kiray's motion for new trial was also denied. Kiray appeals.

## II. Merits

### A. Qualified Privilege

Kiray argues that both the statements made by Hy–Vee employees and the dra-

matic pantomime they created by making her pass through the security gates were defamatory. Hy–Vee argues Kiray failed to present a prima facie case of defamation because Hy–Vee employees never accused her of shoplifting. It points out that Iowa courts have never found dramatic pantomime alone enough to constitute defamation. Further, Hy–Vee argues that even if we do find dramatic pantomime by itself enough to submit a defamation claim to the jury, no such pantomime occurred here.

The trial court submitted the defamation claim to the jury, but determined a qualified privilege attached. As a result, Jury Instruction Number 16, element 4, instructed the jury it could not find defamation unless Hy–Vee had acted with knowing or reckless disregard of the truth of its statements. In other words, in order to find for Kiray, the jury had to find Hy–Vee acted with actual malice. Kiray now argues the qualified privilege instruction should not have been given.

We therefore address two questions: (1) whether the district court was correct in submitting the defamation claim to the jury and (2) whether the district court was correct in instructing the jury as to the qualified privilege. We review both questions for correction of errors at law. Iowa R.App. P. 6.4; *Estate of Pearson ex rel. Latta v. Interstate Power and Light Co.,* 700 N.W.2d 333, 340 (Iowa 2005) (reviewing a challenge to jury instructions).

■ First, defamation is the invasion of another's interest in reputation or good name. *Taggart v. Drake Univ.,* 549 N.W.2d 796, 802 (Iowa 1996). It is comprised of the twin torts of libel and slander. *Id.* To establish a prima facie case of defamation, the "plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Id.*

In *Winckel v. Von Maur,* 652 N.W.2d 453 (Iowa 2002) (abrogated on other grounds by *Barreca v. Nickolas,* 683 N.W.2d 111 (Iowa 2004)), our supreme court reviewed a claim of defamation arising from an incident during which defendant Von Maur accused plaintiff Winckel of shoplifting. Winckel had been browsing at Von Maur when a security guard approached her. *Winckel,* 652 N.W.2d at 456. The guard led her through the store to the manager's office, where she was accused of shoplifting not only from Von Maur, but also from other stores. *Id.* The supreme court concluded that, in addition to basing its defamation award on conversations among store personnel and between store personnel and police, "the jury could also consider the effect of the dramatic pantomime created by plaintiff being marched through the store as a defamatory act." *Id.* at 459.

Based on the court's language in *Winckel,* we conclude the district court correctly submitted Kiray's defamation claim to the jury. Though the record indicates Hy–Vee employees never believed or accused Kiray of shoplifting, under *Winckel,* the jury may consider a dramatic pantomime a separate and distinct defamatory act. Thus, the district court properly submitted to the jury the issue of whether passing Kiray and her bag through the security gates amounted to a defamatory dramatic pantomime.

■ Second, a qualified privilege constitutes immunity from liability for defamation. *Barreca v. Nickolas,* 683 N.W.2d 111, 117 (Iowa 2004). It is found to exist with respect to an otherwise defamatory statement when

(1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest;

and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only. *Winckel*, 652 N.W.2d at 458. A qualified privilege can be lost if it is abused. *Barreca*, 683 N.W.2d at 117. Abuse occurs, for example, when a statement is made with actual malice. *Id.* A statement is made with actual malice when the statement is made with a "knowing or reckless disregard" for the truth. *Id.* at 121 (discarding the common law wrongful motive standard and adopting by analogy the *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), reckless disregard standard).

Kiray argues Hy–Vee cannot rely upon a qualified privilege. First, Kiray claims that because Hy–Vee employees never believed she was shoplifting, the store had no viable interest to protect. *See Winckel*, 652 N.W.2d at 459 (indicating uncertainty whether qualified privilege should attach to Von Maur employee's accusations of theft from other stores). Second, she claims that the statement was received by other shoppers who were improper parties, thus defeating the privilege.

Again, we rely on *Winckel*. The court in *Winckel* expressed uncertainty whether statements that Winckel had shoplifted from other stores were imbued with enough interest for a qualified privilege to attach. *Id.* at 459. It nonetheless concluded the dramatic pantomime whereby Winckel was "marched through the store" did meet the requirements for a qualified privilege instruction. *Id.* at 459. Kiray relies heavily on the dramatic pantomime in *Winckel* to persuade us her defamation claim was properly submitted to the jury. As Kiray argues she was "paraded" through the security gates before other patrons with all of her belongings, so too was Winckel marched through Von Maur before other patrons with all of her be-

longings. Because our supreme court concluded the qualified privilege should have been given in *Winckel*, we think the district court properly gave it here.

■ Kiray further argues the jury should have been instructed on the full range of circumstances that could have constituted an abuse of qualified privilege. This, however, is the first time she has raised this objection. As a result, we cannot review it. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

### B. Additional Instruction on False Imprisonment

■ Kiray argues the district court erred by refusing to give the jury her proposed instruction on false imprisonment. She claims the jury should have been instructed that "the exercise of control over the property of a person by another can serve to restrain the person to whom the property belongs," and that "a customer can be restrained against his or her will when he or she submits to a store employee's asserted authority to search a bag or the person."

Again, we review challenges to jury instructions for errors at law. *Pearson*, 700 N.W.2d at 340. We review the court's refusal to give an instruction for abuse of discretion. *Kiesau v. Bantz*, 686 N.W.2d 164, 171 (Iowa 2004). A court must give a proposed instruction if the instruction (1) correctly states the law, (2) has application to the case, and (3) is not stated elsewhere in the instructions. *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 823 (Iowa 2000). Additionally, the proposed instruction must be supported by both the pleadings and substantial evidence. *Beyer v. Todd*, 601 N.W.2d 35, 38 (Iowa 1999). In

reviewing a proposed instruction, we view the evidence in the light most favorable to the party requesting the instruction. *Weyerhaeuser*, 620 N.W.2d at 824. If error occurs, however, we will only reverse if it results in prejudice to the party requesting the instruction. *Id.* "Prejudice results when the trial court's instruction materially misstates the law, confuses or misleads the jury, or is unduly emphasized." *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 268 (Iowa 2000).

We conclude the district court properly refused Kiray's proposed instruction. First, Iowa law on false imprisonment does not support her proposal. In Iowa, "false imprisonment is the unlawful restraint of an individual's personal liberty or freedom of movement." *Zohn v. Menard, Inc.*, 598 N.W.2d 323, 326 (Iowa Ct.App.1999). The tort consists of two essential elements: (1) detention and restraint against the individual's will and (2) the unlawfulness of the detention or restraint. *Id.* The detention or restraint need not be accomplished through physical force or threats of physical force. *Id.* at 327. Instead, it can be the result of submission to asserted legal authority. *Id.* Kiray cannot point to a case where we have specifically determined that one individual's exercise of control over the property of another can serve to restrain the person to whom the property belongs.

Second, in the *Zohn* case, upon which Kiray heavily relies, the district court dismissed a claim of false imprisonment where a plaintiff was detained by a store employee for a search of his shoulder bag. The supreme court concluded a fact question existed as to whether the plaintiff had been detained against his will. *Id.* It did not determine that the customer was restrained against his will when he submitted to a store employee's authority to search his bag. Instead, the *Zohn* court remanded the question for the jury's de-

termination. *See id.* Here, the court submitted to the jury the question of whether Kiray had been detained against her will. Under *Zohn*, no more was required.

Finally, the jury instructions pertaining to false imprisonment both sufficiently addressed the issue and correctly reflected the law on false imprisonment in Iowa. The jury was informed that physical force or threat of physical force was not required for a finding of detention or restraint against the will. Jurors were free to determine Kiray was detained against her will for some other reason.

## C. Discrimination Claim

■ Kiray brought her race discrimination claim under Iowa Code section 216.7(1)(a) (2001). The district court dismissed Kiray's claim for failure to present a prima facie case of discrimination. In its order, the district court concluded:

Based upon the evidence presented at trial, the Court finds that Plaintiff has failed to establish a prima facie case of discrimination. The Court finds that race was not an issue in this encounter with Hy–Vee on the part of the Defendants. Ms. Kiray herself is the only person who raised the issue of her race after she was stopped. There was no evidence that she was selected from a group of people. The Court finds from the evidence, which includes a video of Ms. Kiray leaving the store as she passed through the sensors, that there were no other persons in that immediate vicinity when the sensors sounded. The Court finds Hy–Vee employees had a legitimate non-discriminatory reason for having approached Ms. Kiray as the person closest to the sensors when they sounded and in their attempts to locate the source triggering the sensor.

We review a district court's ruling on a motion to dismiss for correction of errors

at law.[1] Iowa Rule App. P. 6.4. In doing so, we construe the facts in the light most favorable to the nonmoving party. *Iowa Coal Mining Co., Inc. v. Monroe County*, 555 N.W.2d 418, 438 (Iowa 1996). The moving party is considered to have admitted the truth of all the evidence offered by the nonmoving party, including every favorable inference that fairly and reasonably may be deduced from it. *B & B Asphalt Co., Inc. v. T.S. McShane Co.*, Inc, 242 N.W.2d 279, 284 (Iowa 1976). A motion to dismiss should only be sustained if evidence is insufficient as a matter of law to permit the nonmoving party to recover. *Rodgers v. Baughman*, 342 N.W.2d 801, 804 (Iowa 1983).

Under Iowa Code section 216.7:

1. It shall be an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation or any agent or employee thereof:

a. to refuse or deny to any person because of race, creed, color, sex, national origin, religion or disability the accommodations, advantages, facilities, services or privileges thereof, or otherwise to discriminate against any person because of race, creed, color, sex, national origin, religion, or disability in the furnishing of such accommodations, advantages, facilities, services, or privileges.

Our civil rights cases are guided by federal law and federal cases. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989).[2] We look to the analytical framework used by the federal courts in interpreting federal law, but do not substitute the language of the federal statutes for the language of the Iowa Civil Rights Act. *Id.* In reviewing this civil race discrimination suit, we use the shifting burden of proof framework outlined in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Under the *McDonnell Douglas/Burdine* framework:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for [the defendant's action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093, 67 L.Ed.2d at 214–15 (internal quotations and citations omitted). The ultimate burden of persuading the trier of fact that defendant's actions were discriminatory remains at all times with the plaintiff. *Hicks*, 509 U.S. at 511–518, 113 S.Ct. at 2749–54, 125 L.Ed.2d at 418–24; *Burdine*,

---

1. The district court characterized Hy–Vee's motion as a motion for directed verdict. Because this claim was tried to the bench, however, it should have been characterized as a motion to dismiss. *Iowa Coal Mining Co., Inc. v. Monroe County*, 555 N.W.2d 418, 438 (Iowa 1996). "The misnomer is not material, however, because a motion to dismiss during trial is equivalent to a motion for directed verdict." *Id.*

2. When *Hulme* was decided, civil rights were contained in Iowa Code chapter 601A. Currently, the relevant chapter is 216.

450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215.

Because *McDonnell Douglas, Burdine,* and *Hicks* are employment discrimination cases, we must adapt the required prima facie case to the factual situation at hand.[3] *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, 36 L.Ed.2d at 677–78 n. 13 (noting that the facts in discrimination cases will vary, "and the specification ... of the prima facie case required from respondent is not necessarily applicable in every respect to differing factual situations"). Neither Iowa nor the federal courts, however, have adopted a uniform adaptation of the *McDonnell Douglas/Burdine* framework for race discrimination in public accommodation situations. Kiray urges us to use the prima facie case formulation in *Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694 (D.Md. 2000) (adapting the *McDonnell Douglas* prima facie case to a 42 U.S.C. § 1981 proceeding). Under that test, to satisfy a prima facie case of discrimination, plaintiffs must show

> (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a

markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*Callwood,* 98 F. Supp 2d at 707.

The *Callwood* prima facie case has been adopted by the Second and the Sixth Circuits, along with various other federal district courts. *See Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101–02 (2d Cir.2001); *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 870–74 (6th Cir.2001); *Thompson v. Southwest Airlines Co.,* No. Civ. 04–CV–313–SM, 2006 WL 287850 (D.N.H. Feb.6, 2006); *Robinson v. State Farm Mut. Auto. Ins. Co.,* No. 05–CV–70075, 2005 WL 3358856 (E.D.Mich. Dec. 9, 2005); *Johnson v. York Simpson Underwood, L.L.C.,* No. 1:03CV01141, 2005 WL 1378848 (M.D.N.C. June 9, 2005); *Brooks v. Collis Foods, Inc.,* 365 F.Supp.2d 1342, 1354–57 (N.D.Ga. 2005); *O'Neill v. Gourmet Sys. of Minn., Inc.,* 213 F.Supp.2d 1012, 1019–21 (W.D.Wis.2002).

The Fourth Circuit, however, declined to adopt the test, finding it inapplicable to a case where there was sufficient comparative evidence showing how the African–American plaintiff was treated differently from similarly situated white individuals. *Williams v. Staples, Inc.,* 372 F.3d 662, 668 n. 5 (4th Cir.2004). The Ninth Circuit thought the *Callwood* formulation was compelling, but also declined to adopt it in a case where the plaintiff provided sufficient evidence of the defendant's treatment of similarly situated individuals of a different class. *Lindsey v. SLT Los Angeles, L.L.C.,* 432 F.3d 954, 959–60 (9th Cir.2005). The First Circuit declined to review the third prong of *Callwood,* determining in-

---

**3.** In employment discrimination cases, the plaintiff's prima facie case consists of showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

stead the plaintiff's case would not pass muster even under *Callwood's* broader construction. *Garrett v. Tandy Corp.*, 295 F.3d 94, 102 (1st Cir.2002). Other federal district courts have refused to adopt the *Callwood* test. *See Watkins v. Lovley Dev., Inc.*, No. Civ. 04–211–B–H, 2005 WL 2746664 (D.Me. Oct.24, 2005); *Solomon v. Waffle House, Inc.*, 365 F.Supp.2d 1312, 1325 (N.D.Ga.2004); *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1269–70 (D.Kan.2003); *Benton v. Cousins Props., Inc.*, 230 F.Supp.2d 1351, 1370 (N.D.Ga. 2002).

In an alternative to the *Callwood* test, the Fourth Circuit concluded a plaintiff met his prima facie case when he showed (1) he was a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the ordinary requirements for the contractual relationship; and (4) he was denied the opportunity to enter into the contract with the defendant, even though the defendant afforded such an opportunity to a white customer. *Williams*, 372 F.3d at 668; *cf. Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1101–02 (10th Cir.2001) (using similar prima facie case formulation); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996) (same).

In reviewing claims for racial discrimination in public accommodations, courts recently have followed either the *Callwood* test or variations of the *Williams* test. The difference between the two is marked by the circumstantial evidence the plaintiff may use to show discrimination. Under *Callwood*, the plaintiff may either produce evidence indicating similarly situated individuals outside the protected class were treated differently or show the defendant acted in a markedly hostile manner. Factors relevant to determining what constitutes markedly hostile behavior include conduct that

(1) is so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.

*Callwood*, 98 F. Supp 2d at 708.

Under *Williams*, the plaintiff needs to show she was treated differently from similarly situated individuals outside the protected class. The advantage in the *Callwood* test is that plaintiffs may still meet the prima facie case for discrimination even if there is little evidence as to how members of the protected class are treated differently from members outside the class. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 215 (noting the burden of establishing the prima facie case should not be onerous). The disadvantage is that many courts have found the "markedly hostile" language of *Callwood* to be at best unhelpful and at worst vague. *See Watkins*, No. Civ. 04–211–B–H; *Benton*, 230 F.Supp.2d at 1378.

If there was a time to adopt the *Callwood* test, this would be the case in which to do it. Kiray presents no evidence of similarly situated individuals. Without guidance from either the Eighth Circuit or our supreme court, however, we are loath to do so. Instead, we conclude Kiray fails to meet the prima facie case under both tests.

First, Kiray fails to meet her burden of proof as to prong 3(a) of the *Callwood* test and prong 4 of the *Williams* test: she presents no evidence there were similarly situated individuals outside her protected class who were treated differently. In her direct testimony, Kiray said there were two people who walked out of Hy–Vee in front of her. However, she did not testify to their race. Further, though she presented Hy–Vee's security logs document-

ing the number of people stopped by the Sense–o–Matic system and the nature of each incident, there is no evidence showing the race of the individuals stopped.

Second, Kiray fails to meet her burden as to prong 3(b) of the *Callwood* test. She cannot show that Hy–Vee's actions were "markedly hostile." Taking the facts as Kiray relates them, Hy–Vee asked her permission to run her purse and grocery bag through the security gates. She claims Kearney "made reference to black," but she never testified to what Kearney said. By her own admission, she told Kearney she was "not black from here, I'm a mother." Kearney and Patterson may not have interacted with Kiray according to Hy–Vee's customer service instruction, or even as politely as they should have, but there is no indication they acted in a "markedly hostile" manner. *See Callwood,* 98 F.Supp.2d at 707 (noting "the days of 'the customer is always right' are long past, assuming they ever existed at all").

Because Kiray fails to meet the prima facie case for racial discrimination, we need not explore the next steps in the *McDonnell Douglas/Burdine* framework. *See Hicks,* 509 U.S. at 509–11, 113 S.Ct. at 2748–50, 125 L.Ed.2d at 417–19. The district court's order dismissing Kiray's discrimination claim is affirmed.

### D. *Batson* Claim

■ Kiray argues the district court erred when it overruled her *Batson* objection. She claims Hy–Vee's peremptory strike of juror Grant was based on his national origin. Hy–Vee argues that Kiray's objection was not preserved. It claims her objection at trial was based on race, not national origin.

In *Batson,* the Supreme Court ruled that discrimination against jurors based on their race violates the Equal Protection Clause. *Batson* was applied to civil cases

in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Its ruling was extended to discrimination based on gender in *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). It also has been extended to discrimination based on Latino ethnicity. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

We conclude Kiray's *Batson* objection preserved her argument based on national origin discrimination. First, Kiray's attorney objected to the defense's use of peremptory strikes against "African–American" jurors. He never specifically said whether he was objecting to race or national origin. The intersection of race and national origin is a difficult one to parse. It is a question even the Supreme Court has failed to definitively answer. *See St. Francis College v. Al–Khazraji,* 481 U.S. 604, 610–13, 107 S.Ct. 2022, 2026–28, 95 L.Ed.2d 582, 589–91 (1987). Race, national origin, and ethnicity are all fluid concepts; at varying times in our history they have been considered both the same and different. *Id.* Kiray objected to the fact the defense struck African–American jurors. In doing so, she got her point across: the defense was exercising peremptory strikes against black jurors. *See State v. Williams,* 695 N.W.2d 23, 27–28 (Iowa 2005) (finding error preserved "where grounds for a motion were obvious and understood by the trial court and counsel"). Whether the jurors were black because of their race or national origin, we decline to venture a guess. We conclude she sufficiently established her *Batson* objection.

Second, Hy–Vee answered the *Batson* objection with two reasons for the strike: (1) Juror Grant was not a born citizen of the United States and (2) his views of justice in this country made the attorney

question his ability to be fair and impartial. Kiray's attorney countered that another juror, Juror Chen, could also have been stricken for the same reasons Juror Grant was stricken. However, he also said he understood Juror Chen's view of justice was more complicated than Juror Grant's view. We take Kiray's attorney's statements following Hy–Vee's proffered explanation as an observation that another juror was retained despite his particular national origin.[4] This observation is probative in a *Batson* analysis, and serves to preserve Kiray's argument.

■ Hy–Vee also argues it is unclear whether *Batson* actually applies to national origin. The Supreme Court has so far declined to directly answer the issue. *Id.* at 371–72, 111 S.Ct. at 1872–73, 114 L.Ed.2d at 413–14. There are several reasons, however, that lead us to believe that, at least in this situation, it does. First, a party's ability to strike individual jurors through peremptory challenges "is subject to the commands of the Equal Protection Clause." *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82. Under the Court's equal protection jurisprudence, national origin classifications receive the same strict scrutiny analysis race classifications receive. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541–42 (1971). Second, in *J.E.B.,* the Court extended Batson to cover gender discrimination in jury selection. *J.E.B.,* 511 U.S. at 146, 114 S.Ct. at 1430, 128 L.Ed.2d at 107–08. In equal protection analysis, however, gender classifications receive a lesser scrutiny than national origin classifications. *Compare Cleburne,* 473

U.S. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320 (noting classifications based on national origin "are subject to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest") *with id.* at 440–41, 105 S.Ct. at 3254–55, 87 L.Ed.2d at 320–321 (noting classifications based on gender are subject to heightened scrutiny and will be sustained only if they are "substantially related to a sufficiently important governmental interest"). Third, in *Hernandez,* the Court seemed to use the words ethnicity and race interchangeably. *See, e.g., Hernandez,* 500 U.S. at 355, 111 S.Ct. at 1864, 114 L.Ed.2d at 403. It also wrote that *Batson* may extend where a group's characteristics could be used as a surrogate for race discrimination. *Id.* at 371–72, 111 S.Ct. at 1872–73, 114 L.Ed.2d at 413–14 (noting specifically that skin color or a particular language proficiency may act as a surrogate for race under an equal protection analysis). Finally, other courts have used *Batson* to analyze peremptory strikes used against jurors belonging to groups traditionally subjected to discrimination. *See Brewer v. Marshall,* 119 F.3d 993 (1st Cir.1997) (employing *Batson* and using "race" and "ethnicity" interchangeably where record was unclear as to whether jurors were black and/or Hispanic); *United States v. Taylor,* 92 F.3d 1313, 1330 (2d Cir.1996) (using *Batson* analysis to evaluate peremptory strikes against white, black, and Latino jurors); *United States v. Krout,* 66 F.3d 1420, 1428–29 (5th Cir.1995) (extending *Batson* analysis to a juror of "Hispanic ethnicity"); *United States v. Canoy,* 38 F.3d 893, 897–98 (7th Cir.1994) (extending *Batson* analysis to a juror of Asian descent). We therefore

---

4. This analysis is made more difficult because the record does not indicate the national origin of either Juror Grant or Juror Chen.

conclude that, in this situation, *Batson* extends to national origin.

■ A *Batson* analysis is similar to the *McDonnell Douglas* framework above. Under *Batson*, Kiray must first make a prima facie case of discrimination. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. The burden then shifts to the Hy–Vee to present a neutral explanation for challenging the jurors. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Hy–Vee's explanation must be deemed neutral unless a discriminatory intent is inherent. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995). Once Hy–Vee offered its explanation, the issue of whether Kiray made a prima facie showing is moot. *Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405. Our question then, is the final step under the *Batson* analysis: whether Kiray has carried her burden of proving purposeful discrimination. *Id.*

In answering Kiray's *Batson* objection, Hy–Vee's attorney said he struck Juror Grant for two reasons. The first reason, that Juror Grant is not a born citizen of the United States, appears to be discriminatory.[5] The second reason, that Juror Grant's beliefs about justice in this country causes concern about his ability to be impartial, is neutral. The attorney bolstered his second reason by pointing out that he struck a white juror for the very same beliefs. His conclusion, that he struck "three people, because of their views of our justice system, not because of their race, creed, color, origin, or anything else," also bolsters his neutral reason.

Where it appears there is dual motivation, or both discriminatory and non-discriminatory reasons for striking a juror,

the Eighth Circuit has determined the strike does not violate equal protection as long as the strike would have been exercised without the discriminatory reason. *Weaver v. Bowersox*, 241 F.3d 1024, 1032 (8th Cir.2001). Because our supreme court has not had the opportunity to answer the question, we follow the Eight Circuit's lead. Hy–Vee only provided two reasons for exercising a strike against Juror Grant. The second, neutral reason, however, was supported with an example of a juror outside the protected class who was struck for the same neutral reason. Further, Hy–Vee denied striking Juror Grant for any discriminatory reason. While that statement, standing alone, would not suffice to satisfy *Batson*, we conclude that (1) since Hy–Vee provided a neutral explanation and (2) it struck a white juror for the same neutral reason, Hy–Vee would have exercised a strike against Juror Grant regardless of his national origin. We therefore affirm the district court's ruling denying Kiray's *Batson* claim.

### III.  Conclusion

First, the district court properly submitted Kiray's defamation claim to the jury. Second, it correctly instructed the jury as to Iowa defamation and false imprisonment law. Third, Kiray has failed to show a prima facie case for race discrimination. Finally, the district court correctly denied Kiray's *Batson* objection. The district court ruling is affirmed.

**AFFIRMED.**

---

5.  Other than the fact that he is African–American, there is no indication of Juror Grant's national origin.