# IN THE SUPREME COURT OF IOWA

No. 21–1327

Submitted January 19, 2023—Filed June 30, 2023
Amended August 31, 2023

**DAVINA VALDEZ,**

Appellant,

vs.

**WEST DES MOINES COMMUNITY SCHOOLS** and **DESIRA JOHNSON,**

Appellees.

---

Appeal from the Iowa District Court for Polk County, Jeffrey Farrell, Judge.

Plaintiff appeals the judgment entered in favor of defendants on her Iowa Civil Rights Act and common law claims. **AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Megan C. Flynn (argued) of Flynn Law Firm, P.L.C., West Des Moines, and Angela L. Campbell of Dickey, Campbell & Sahag Law Firm, P.L.C., Des Moines, for appellant.

David T. Bower (argued) and Logan Eliasen of Nyemaster Goode, P.C., for appellees.

**OXLEY, Justice.**

Davina Valdez, a teacher's associate who worked with special education students at West Des Moines Community Schools (the District), sued the District and one of its teachers, Desira Johnson (collectively, Defendants), alleging Johnson engaged in racial discrimination that led to Valdez's constructive discharge in violation of the Iowa Civil Rights Act (ICRA). At trial, the district court concluded Johnson was not subject to individual liability under the ICRA as a matter of law, and the jury returned a defense verdict in favor of the District. Valdez now asks this court to grant her a new trial based on any of five alleged errors, focusing primarily on two: that the district court should have granted her *Batson*[1] challenge to Defendants' peremptory strike of the only Black potential juror and that Johnson can be held personally liable for her constructive discharge under our recent holding in *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 33–37 (Iowa 2021). After careful consideration of Valdez's arguments, we affirm the district court.

### I. Factual History.

Valdez began working for the District in 2015 as a special education teacher's associate. In her position, Valdez worked with other special education associates in a classroom overseen by a special education teacher and worked primarily with a single special needs student, C.O. In the fall of 2018, Valdez

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986); *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628–31 (1991) (extending *Batson* to civil cases).

followed C.O. as C.O. advanced grade levels, moving with her to Valley High School.

The same year Valdez moved to Valley High, Jill Bryson became the assistant principal in charge of special education. Bryson had performance concerns with Kylene Simpson, the teacher overseeing Valdez's classroom, culminating in a separation agreement between Simpson and the District on March 8, 2019. To round out the school year in Simpson's place, Bryson enlisted Jo Yochum to oversee Valdez's classroom. Bryson also asked Johnson—another special education teacher who oversaw a different classroom—to assist Yochum in her new duties. It was at this point that the events precipitating Valdez's lawsuit began in earnest.

As the district court put it, "The change from Ms. Simpson to more involvement from Ms. Johnson was not well-received by the associates in Ms. Simpson's classroom," and "[a]ll of the associates and Ms. Yochum felt that Ms. Johnson was micro-managing the classroom." Valdez, though, felt particularly singled out by Johnson. For instance, Valdez (who is Black) alleged that on one occasion, Johnson (who is white) approached her and Toree Daniel (another special education associate, who is biracial) and asked, "[W]hy would a Black student call a white lady a[n] [N-word]?"—using the actual word rather than the euphemism "N-word."[2] Valdez also complained that Johnson was making changes to the classroom that negatively affected C.O., such as moving

---

[2]Johnson may not have phrased her question in precisely this manner when she posed it to Valdez and Daniel, but it is not disputed that she used the full "N-word."

C.O.'s swing (something C.O. used to calm herself) to a different room in the building without consulting Valdez and in an effort to harass or intimidate Valdez.

After a meeting with Bryson and Principal David Maxwell, in which Valdez was accused of "not being a team player," Valdez filed a complaint with Carol Seid, the associate superintendent for human resources (HR) for the District. Valdez complained about Johnson announcing "she would be taking over the classroom" despite Yochum being appointed to finish the school year, of "feel[ing] completely harassed [and] singled out," of "hav[ing] some physical sickness with the thought of going to work," and about changes in students' behavior following Johnson's "tak[ing] over" the classroom.

Seid referred the complaint to Jesse Johnston—another District HR employee—for investigation. While the investigation was ongoing, Valdez again contacted HR, complaining that the harassment had not stopped and stating that she felt "now more than ever discriminated against and work is more tense and hostile than ever." Johnston emailed Valdez on May 28 to discuss the results of her investigation, which concluded Valdez's complaints were unfounded, but Valdez did not respond.

The same day, May 28, Valdez's attorney emailed superintendent Lisa Remy, alleging Valdez was being subjected to a hostile work environment based on her race and retaliated against based on her complaints to HR. The letter directed Bryson, Seid, and Johnson to avoid all contact with Valdez and threatened litigation if a response was not received within a week. When the

District eventually responded on June 25, it "offered to work with [Valdez] on a reassignment to another supervisor or building within the district." Valdez did not respond to the District's offer and tendered her resignation the next day, June 26.

Valdez filed the instant lawsuit on December 13, asserting ICRA claims for race-based discrimination, hostile work environment, unequal pay, and retaliatory constructive discharge as well as a common law claim of wrongful discharge in violation of public policy. *See* Iowa Code §§ 216.6, .6A, .11 (2019). All of the counts were levied against the District and against Johnson in her individual capacity.

The case proceeded to trial in April 2021 on Valdez's claims of hostile work environment and retaliatory constructive discharge under the ICRA and common law wrongful discharge. At the close of evidence, the district court granted Johnson's motion for directed verdict, removing her as an individual defendant from the case. The jury returned a verdict in the District's favor on all counts.

Valdez appeals several of the district court's rulings, arguing the court erred by: (1) overruling her *Batson* challenge to Defendants' peremptory strike of Juror 13; (2) granting Johnson's directed verdict motion; and (3) ruling in Defendants' favor on three evidentiary issues—admitting parts of the parties' settlement correspondence from June 2019 (Exhibits B-11 and B-12), excluding notes pertaining to the District's investigation into Valdez's harassment complaints (Exhibit 6), and excluding evidence of an incident involving Johnson and a student in Valdez's classroom. We retained the appeal.

**II. Analysis.**

**A. *Batson* Challenge.** In addition to challenging Defendants' peremptory strike of Juror 13 under the traditional *Batson* standard, Valdez asks us to revise the standard for assessing peremptory challenges under the Iowa Constitution. Applying the traditional *Batson* framework, we hold that the district court properly overruled Valdez's challenge. And for the reasons that follow, we conclude that Valdez's arguments for moving "beyond *Batson*" in the specific ways she suggests are not compelled by the Iowa Constitution.

1. *Did the District violate* Batson *in striking Juror 13?* We review *Batson* challenges de novo. *State v. Veal*, 930 N.W.2d 319, 327 (Iowa 2019). Analyzing Valdez's *Batson* challenge involves a three-step inquiry: (1) Valdez must establish a prima facie case of purposeful racial discrimination in Defendants' peremptory strike; (2) Defendants must proffer a race-neutral explanation for the strike; and (3) Valdez must carry the ultimate burden of proving purposeful discrimination, which turns on whether the strike "was 'motivated in substantial part by discriminatory intent.' " *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243–44 (2019) (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)); *see State v. Booker*, 989 N.W.2d 621, 627 (Iowa 2023). Within our de novo review, "we give 'a great deal of deference' to the district court's evaluation of credibility when determining" whether the strike was motivated by a discriminatory intent at this final step. *See Booker*, 989 N.W.2d at 627 (quoting *Veal*, 930 N.W.2d at 327).

Juror 13, the only Black venire member, was struck by Defendants' second peremptory strike. In response to Valdez's *Batson* objection, Defendants

proffered three race-neutral reasons for the strike: (1) Juror 13 had management experience but no experience with workplace complaints against him; (2) defense counsel "did not have a good rapport" with him; and (3) his response to defense counsel's question about whether he could "start [the parties] out on equal footing," to which he replied, "Yes," but then added, "But, I mean, something happened" (this question-and-answer combination will be referred to as "the parity question" for brevity). The court accepted these justifications and overruled the *Batson* challenge.

Valdez raised the *Batson* issue again in her motion for a new trial. In resistance, Defendants gave the same justifications for the strike and added two new ones: (1) that Juror 13 "stated [his] belief that people are always 'honest' " in workplace complaint investigations, and (2) he was potentially familiar with the trial judge based on his work with the Fifth Judicial District Department of Correctional Services. The court again rejected the *Batson* challenge based on the rapport and the parity question justifications and affirmed its earlier *Batson* ruling despite finding that Defendants' other justifications were "less convincing."

Given that all three prongs of the *Batson* challenge were fully developed below, "the preliminary issue of whether [Valdez] ha[s] made a prima facie showing [is] moot." *State v. Mootz*, 808 N.W.2d 207, 218 (Iowa 2012) (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991)). Step two focuses on the facial validity of the striking attorney's explanation. *Id.* "Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race

neutral." *Id.* (alteration in original) (quoting *Hernandez,* 500 U.S. at 360). A proffered justification " 'need not rise to the level justifying exercise of a challenge for cause' but must be race-neutral and 'related to the particular case to be tried.' " *Veal,* 930 N.W.2d at 334 (quoting *State v. Griffin,* 564 N.W.2d 370, 375 (Iowa 1997)). The justification need not be "persuasive, or even plausible" at this stage. *Mootz,* 808 N.W.2d at 218 (quoting *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam)). "It is not until step three 'that the persuasiveness of the justification becomes relevant.' " *Id.* (quoting *Purkett,* 514 U.S. at 768).

Neither Juror 13's response to the parity question nor his experience as a manager is characteristic of any particular race. *See, e.g., Booker,* 989 N.W.2d at 629 (concluding the effect of a juror's "third-shift job on his ability to focus" was race-neutral); *Veal,* 930 N.W.2d at 334 (holding that prosecutor's striking "a juror because the same prosecutor had sent her father to prison for the rest of his life" is "a valid, race-neutral reason for" a strike). Whether an asserted "lack of rapport" is facially neutral is a closer question, but the authorities Valdez cites to support her contention that it is not facially neutral are inapposite. *See George v. State,* 588 S.E.2d 312, 317–18 (Ga. Ct. App. 2003) (finding rapport justification "too vague, subjective, nonspecific, and noncase-related to meet the requirements of *Batson,*" without specifying whether the justification failed at step two or three); *State v. Weatherspoon,* 514 N.W.2d 266, 269–70 (Minn. Ct. App. 1994) (holding not only that the rapport explanation, "though troublesome, constitutes a facially race-neutral explanation" at step two but also that the *Batson* challenge in that case failed at step three as well). Without opining on

whether "rapport" justifications are always race-neutral at step two,[3] we conclude that given the development of the record about rapport in this case (outlined below), it was facially neutral here. *Cf. Batson v. Kentucky*, 476 U.S. 79, 98 n.20 (1986) ("[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981))).

Finally, at step three of the *Batson* inquiry, courts "must 'decide whether to believe the [attorney's] explanation for the peremptory challenges,' or whether the reasons given are merely pretext for racial discrimination." *Booker*, 989 N.W.2d at 630 (alteration in original) (quoting *Mootz*, 808 N.W.2d at 219). We give great deference to the trial judge's finding at this step since "whether purposeful discrimination exists will largely turn on evaluation of credibility." *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990); *see also Booker*, 989 N.W.2d at 630.

Defendants' assertion that counsel lacked a good rapport with Juror 13 is a perfect example of why we give such deference to trial courts. When justifications such as a juror's rapport or demeanor are raised, "the trial court

---

[3]Some judges and commentators have observed that subjective justifications for a strike, such as rapport or demeanor, are particularly subject to influence from implicit biases since "implicit biases can lead members of different races to perceive members of other races as lazy, or hostile, or threatening" when identical words or conduct from a member of the same race would not trigger the same impressions. Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 164 (2010); *see Batson*, 476 U.S. at 106 (Marshall, J., concurring) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.").

must evaluate not only whether the [striking counsel]'s demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by [counsel]." *Snyder v. Louisiana*, 552 U.S. 472, 477, 479 (2008).

> The attorneys should fully develop the record concerning the specific behavior by venire members that motivated the peremptory challenge, and the district court should assess the credibility of the explanation. Because the district court is in the best position to evaluate the truthfulness of an asserted explanation, its findings should be accorded deference on appeal.

*United States v. Jenkins*, 52 F.3d 743, 746 (8th Cir. 1995) (citations omitted); *see also State v. Khoang*, No. 98–2092, 1999 WL 1159027, at *5 (Iowa Ct. App. Dec. 13, 1999) (citing *Jenkins* and using identical language).

The district court recognized the need for careful scrutiny here based on the subjectiveness of the justification but ultimately concluded that the justification was valid and not pretextual. The court explained:

> [B]ased on my observation of the interaction between attorney and juror, I understand counsel's explanation. It is difficult to show on the transcript, but the juror appeared to be measured or reticent before or as responding to counsel's questions. This is not a bad trait, but it supports defense counsel's belief that he might be a questionable juror for her case.

We defer to the district court's ruling that this justification was sincere and not pretextual.

Aside from a lack of rapport with Juror 13, Defendants consistently proffered—at trial, posttrial, and on appeal—Juror 13's response to the parity question as their "main" justification for the strike. The specific question-and-answer exchange went as follows:

[DEFENSE COUNSEL]: The other thing that -- again, I'm just going to kind of ask you as a group for agreement. Does anybody think that just because we're here, we're in this beautiful courtroom, that it means that there's something to this case? In other words, you already feel like we must have done something wrong just because we're here?

Does everybody understand that we start out on equal footing? Can everybody agree that they're not going to put one side above the other just because we're here and we're taking up resources?

[Juror 13], you agree with that?

JUROR [13]: Yes. But, I mean, something happened. But what it is, I guess you are trying to figure out.

In resistance to Valdez's motion for a new trial, Defendants explained that counsel followed up specifically with Juror 13 on this question because "the entire panel nodded" in response except Juror 13. Defendants also explained that Juror 13's response "raised concern in defense counsel's mind about [his] ability to hear this case—or any case—with an open mind." The court accepted this justification and explanation, reasoning that although potentially "wholly innocent," Juror 13's response "was not prompted by the question" and "could make a defense attorney hesitant when considering her strikes."

Again, given that the record could reasonably be interpreted as each party urges, we defer to the district court's determination that defense counsel's justification here was credible and not pretextual. Juror 13's belief that "something happened" could be, as the district court considered (but rejected), a "wholly innocent" acknowledgment of the fact that "cases do reach trial for a reason." Or, it could evince a preconceived notion that Defendants did something they should not have—a prejudice that defense counsel could reasonably have

believed she would have to work harder to overcome if Juror 13 was impaneled. We will not disturb the trial court's credibility finding here.

Like the district court, we find Defendants' other justifications "less convincing." Defendants' only other contemporaneous justification explained that they struck Juror 13 because he had a long history of managerial experience without having dealt with any employee complaints. But that justification was not applied in a race-neutral manner. Five other jurors claimed some level of management experience: Jurors 4, 5, 8, 12, and 14. No jurors reported having had a complaint lodged against them in the workplace (including those who did not report managerial experience), but only Juror 13 appears to have been struck for this reason. Jurors 4 and 8 were both struck by Valdez,[4] but neither party challenged Jurors 5, 12, or 14—all three of whom ended up on the petit jury. Juror 13 was thus treated differently by Defendants in this regard compared to non-Black venire members. Caselaw provides this is sufficient to permit an inference of, or provide some evidence of, discriminatory intent. *See Foster*, 578 U.S. at 512 ("[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." (second alteration in original) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005))).

On our de novo review, we do not find the evidence here sufficient to show that the strike was substantially motivated by discriminatory intent given the

---

[4]Juror 8 ultimately ended up on the jury, though, after an initially-selected juror was excused for a health emergency.

district court's credibility findings.[5] The strike was supported by two justifications that the district court affirmatively credited as valid and nonpretextual. A reviewing court's "deference [to a trial court's credibility determination] is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder*, 552 U.S. at 479. Here, the district court's credibility determination was explicit and detailed, noting its own observation of Juror 13's behaviors that supported Defendants' perception of a negative rapport. The court also expressly recognized that Juror 13's response to the parity question would make Defendants apprehensive of having him on the jury, rejecting Valdez's assertion that those apprehensions were rehabilitated by subsequent questioning.

---

[5]The district court stated in its posttrial ruling that despite finding some of Defendants' justifications "less convincing," it could uphold the strike of Juror 13 "as long as there is one race-neutral ground for the strike," citing *Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193, 207 (Iowa Ct. App. 2006). *Kiray* followed the lead of the United States Court of Appeals for the Eighth Circuit in applying the same-decision defense to a *Batson* challenge where we had not addressed the issue. *See id.* at 207 (holding that a peremptory strike does not violate *Batson* "as long as the strike would have been exercised without the discriminatory reason" (citing *Weaver v. Bowersox*, 241 F.3d 1024, 1032 (8th Cir. 2001))). As the United States Supreme Court subsequently recognized in *Snyder v. Louisiana* and in *Foster v. Chatman*, it has never "allowed the prosecution to show that 'a discriminatory intent [that] was a substantial or motivating factor' behind a strike was nevertheless not 'determinative' to the prosecution's decision to exercise the strike." *Foster*, 578 U.S. at 513 n.6 (alteration in original) (quoting *Snyder*, 552 U.S. at 485, and declining to "decide the availability of such a defense" where it was not raised by the State). Whether or not the Supreme Court would recognize a same-decision defense in a *Batson* analysis, had the district court here relied only on its statement that finding one race-neutral ground for a strike satisfied *Batson*, it would not even have met that standard absent a finding that the race-neutral reason was the determinative factor. The totality of the district court's ruling reveals it did not rely solely on this statement but concluded that the strike was in fact not substantially motivated by discriminatory reasons. *See Flowers*, 139 S. Ct. at 2244 ("The ultimate inquiry is whether the [strike] was 'motivated in substantial part by discriminatory intent.'" (quoting *Foster*, 578 U.S. at 513)). For present purposes, we caution that finding a single race-neutral ground for a strike does not relieve a district court from nonetheless determining whether the strike was substantially motivated by discrimination.

Valdez's limited evidence of pretext, in light of Defendants' other credible and non-race-based explanations, does not establish that the strike was motivated in *substantial* part by purposeful discrimination. *See Batson*, 476 U.S. at 98 ("The trial court . . . will have the duty to determine if the defendant has established purposeful discrimination."); *cf. Flowers*, 139 S. Ct. at 2248 ("[D]ramatically disparate questioning and investigation of black prospective jurors [as compared to] white prospective jurors . . . strongly suggests that the State was motivated in substantial part by a discriminatory intent."). The district court did not err in overruling Valdez's *Batson* challenge.

2. *Should we move "beyond"* Batson *under Iowa law?* Valdez argues on appeal that if we uphold the district court's denial of her traditional *Batson* challenge, then we should move "beyond *Batson*" by applying a heightened standard to *Batson* challenges as a matter of Iowa constitutional law.

Peremptory strikes were designed to be "exercised without a reason stated" for striking a juror, "without inquiry" into any reasons or motives for the strike, "and without being subject to the court's control." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 147–48 (1994) (O'Connor, J., concurring) (quoting *Swain v. Alabama*, 380 U.S. 202, 220 (1965), *overruled on other grounds by Batson*, 476 U.S. 79). Essentially, parties can use their peremptory strikes for any reason or no reason at all. *See Mootz*, 808 N.W.2d at 215 ("[A] peremptory challenge is, by its very nature, a capricious and arbitrary statutory right . . . ."); *see also* Iowa R. Civ. P. 1.915(7) ("Each side must strike four jurors" in a civil case). Although that level of discretion opens the door to the kinds of discrimination that offend

constitutional principles, *see Batson,* 476 U.S. at 99 ("The reality of practice, amply reflected in many state- and federal-court opinions, shows that the [peremptory] challenge may be, and unfortunately at times has been, used to discriminate against black jurors."), the very nature of peremptory strikes is such that they "must be exercised with full freedom, or [else] fail[] of [their] purpose," *Mootz,* 808 N.W.2d at 221 (quoting *State v. Hunter,* 92 N.W. 872, 874 (Iowa 1902)).

*Batson* therefore aims to remove racial bias from the peremptory strike process without disturbing their discretionary character any more than necessary. *See Batson,* 476 U.S. at 89 ("Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (quoting *United States v. Robinson,* 421 F. Supp. 467, 473 (D. Conn. 1976))). But by leaving the discretionary nature of peremptories intact to the greatest extent possible, scholars observe, *Batson*'s utility in eliminating all discrimination from jury selection is significantly limited. *See* Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions,* 4 Harv. L. & Pol'y Rev. 149, 162 (2010) ("The promise of Batson remains illusory for two reasons in particular: trial judges are reluctant

to doubt prosecutors' proffered reasons for their challenged strikes, and appellate courts are highly deferential to the trial courts' decisions on these matters."); Tania Tetlow, *Solving* Batson, 56 Wm. & Mary L. Rev. 1859, 1888–89 (2015) ("Although peremptories allow us to root out bias that is subtle and unstated, they also tend to skew the jury's diversity and submit potential jurors to the rank stereotyping complained of in Batson."). As the *Batson* majority itself observed: peremptory challenges are, after all, "a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)).

Relying on these criticisms, Valdez offers two specific suggestions for moving beyond *Batson*. First, we should adopt a higher standard for strikes of "last minority" jurors as suggested by Justice Appel in his partial dissent in *State v. Veal* by requiring trial-related justifications at *Batson* step two and an objective, reasonable person analysis at *Batson* step three. *See* 930 N.W.2d at 361–62 (Appel, J., concurring in part and dissenting in part). Second, we should require courts to view the evidence in the light most favorable to the party challenging the strike in assessing the proffered race-neutral reasons for a strike.

Valdez identifies article I, sections 1, 6, and 9 of the Iowa Constitution as support for her request for us to move beyond *Batson*. But she does not explain how the specific changes she requests are constitutionally mandated. We have already rejected a similar request to apply a heightened analysis when a party strikes the last minority juror. *See id.* at 334 (majority opinion) (declining the defendant's request to "adopt something like a cause requirement" when the

opposing party used a peremptory strike on the last Black juror as "contrary to our precedent," citing *Griffin*, 564 N.W.2d at 375–76, and *Mootz*, 808 N.W.2d at 218). To the extent that striking the last minority juror has enhanced constitutional significance, its significance implicates fair-cross-section concerns more than equal protection concerns; and even then, a party is not constitutionally entitled to a *petit jury* (as opposed to a jury pool) of any particular composition. *See Holland v. Illinois*, 493 U.S. 474, 482–83 (1990); *State v. Mong*, 988 N.W.2d 305, 311 (Iowa 2023) ("Our cases recognize the fair-cross-section right extends only 'to the jury pool' and not to the jury panel or the petit jury." (quoting *State v. Wilson*, 941 N.W.2d 579, 593 (Iowa 2020))). Valdez does not explain how such a procedure, particularly in the context of a civil trial, flows imperatively from article I, sections 1, 6, or 9 of the Iowa Constitution.

We also decline to adopt Valdez's request to require the evidence to be construed in favor of the party challenging the strike, similar to a summary judgment standard. In a summary judgment proceeding, evidence is considered in the light most favorable to the nonmoving party as a basis for determining whether there are any material facts in dispute for a factfinder to decide. *See, e.g., Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005) ("The question [at summary judgment in a *McDonnell Douglas* burden-shifting case], after all, is simply whether [the plaintiff] has introduced sufficient admissible evidence from which a rational trier of fact could find [the defendant's] alleged reasons for her termination were false, and intentional discrimination was the real reason."). But once the evidence is presented to the factfinder for a final determination, the

factfinder must necessarily decide the facts from the disputed evidence without the summary judgment thumb-on-the-scale standard. Likewise, in a *Batson* challenge, the district court must be free to evaluate the credibility of evidence in determining whether a challenged strike was racially motivated. Indeed, "[t]he trial court has a pivotal role in evaluating *Batson* claims" through its "evaluation of the prosecutor's credibility" in determining the ultimate issue of whether the strike was discriminatory. *Snyder*, 552 U.S. at 477. Adopting Valdez's summary-judgment-type standard is not merely a "small nudge," as she suggests, but would effectively preclude the district court from even making these credibility determinations if there was any evidence to the contrary. We do not see how this furthers the *Batson* inquiry of identifying strikes premised on racial discrimination. *See Veal*, 930 N.W.2d at 327 (noting the "great deal of deference [we give] to the district court's evaluation of credibility when determining the true motives of the attorney" who made the strike (quoting *Mootz*, 808 N.W.2d at 214)).

Many states have taken steps to address some of *Batson*'s perceived shortcomings under state law—either replacing it with a framework better suited to the task or tweaking it to give it more "teeth" in carrying out its mission.[6] Contrary to Valdez's request that we construe our state constitution to require similar reforms, the bulk of movement in this area has come through legislative

---

[6]For a synopsis of recent *Batson* reform measures, see Berkeley L., *Batson Reform: State by State*, https://www.law.berkeley.edu/experiential/clinics/death-penalty-clinic/projects-and-cases/whitewashing-the-jury-box-how-california-perpetuates-the-discriminatory-exclusion-of-black-and-latinx-jurors/batson-reform-state-by-state/ [https://perma.cc/ESV9-C3WX].

or rulemaking processes, not through constitutional interpretation. Even Washington, which has led the charge for *Batson* reform in both the rulemaking and judicial arenas, did so gradually and with the benefit of input from the rulemaking process. In *State v. Saintcalle,* the Washington Supreme Court acknowledged what it perceived to be *Batson*'s shortcomings and its own authority to adopt broader protections under the state constitution, but it declined to do so there because the parties had not argued for a different standard and because the court believed that such a rule change "might also be best made through the rule-making process." 309 P.3d 326, 337–39 (Wash. 2013) (en banc) (plurality opinion), *abrogated by City of Seattle v. Erickson,* 398 P.3d 1124, 1131 (Wash. 2017) (en banc) (adopting a bright-line rule that striking the sole Black juror satisfied step one of a *Batson* prima facie case). After *Saintcalle,* that court enacted Washington General Rule 37 to regulate challenges to peremptory strikes, providing by rule many of the changes Valdez advocates we take here. *See Veal,* 930 N.W.2d at 355–59 (Appel, J., concurring in part and dissenting in part) (describing Washington cases and promulgation of Washington General Rule 37); *see also State v. Jefferson,* 429 P.3d 467, 479–81 (Wash. 2018) (en banc) (effectively applying provisions of Washington General Rule 37 retroactively to proceedings predating its effective date via state constitution).

The foregoing measures have largely been taken by statute or rule. For present purposes, we hold that the two "beyond *Batson*" approaches Valdez seeks in this case are not mandated by the Iowa Constitution.

**B. Directed Verdict on Individual Liability.** Valdez named both the District and Johnson in her individual capacity as defendants in each of the claims that made it to trial, including her ICRA claims for hostile-work-environment discrimination and retaliation and her common law claim of wrongful discharge in violation of public policy. After the close of evidence, the district court concluded there was no evidence from which the jury could find that Johnson acted as Valdez's supervisor, granting a directed verdict for Johnson and removing her as a separate defendant from the case. We review Valdez's appeal from the order granting Johnson's motion for directed verdict for correction of errors at law.[7] *Rumsey*, 962 N.W.2d at 20. " '[W]e view the evidence in the light most favorable to the nonmoving party to determine whether the evidence generated a fact question' that warranted submitting the issues to a jury." *Id.* (alteration in original) (quoting *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 768 (Iowa 2006)).

1. *Individual liability under the ICRA.* Valdez's motion for a new trial made two arguments challenging the directed verdict ruling: first, the jury could have found from the evidence that Johnson was Valdez's supervisor; and second, even

---

[7]On appeal, Valdez does not distinguish her retaliatory constructive discharge claim from her ICRA hostile-work-environment claim and argues only that Johnson could be held individually liable for creating a hostile work environment and for common law wrongful discharge. As best we can discern, though, Valdez's retaliation claim is premised on Johnson furthering, or enhancing, the hostile work environment in retaliation for her complaints to HR. We therefore focus our analysis only on the hostile-work-environment discrimination and wrongful discharge claims and do not consider the scope of liability for retaliatory constructive discharge generally under Iowa Code section 216.11. *See* Iowa R. App. P. 6.903(2)(*g*)(3). *See Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010) ("Our obligation on appeal is to decide the case within the framework of the issues raised by the parties. Consequently, we do no more and no less." (citation omitted)).

if not, Johnson could still be individually liable under the ICRA for creating a hostile work environment. While Valdez's motion was pending, this court decided *Rumsey*, where we held that ICRA "liability for discrimination under section 216.6 or retaliation under section 216.11(2)" can extend to nonsupervisory employees who are "personally involved in, and ha[ve] the ability to effectuate, an adverse employment action[,] . . . assuming the other elements of each claim are satisfied with respect to the individual defendant." 962 N.W.2d at 36. The district court concluded that *Rumsey* did not change the outcome in this case with respect to Johnson's individual liability and denied the new trial motion.

To begin, we agree with the district court that Valdez failed to present evidence at trial to support a finding that Johnson exercised supervisory control over Valdez. *See id.* at 35 (recognizing a supervisor as "hav[ing] the ability to alter the terms of a subordinate's employment"); *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 573 (Iowa 2017) (recognizing supervisor harassment as taking "a tangible employment action" or otherwise using power and authority of position to engage in sufficiently harassing conduct to amount to adverse employment action). Despite Valdez's argument that Johnson "took over" the classroom, the only evidence on the subject established that Johnson lacked supervisory authority over Valdez. Yochum, not Johnson, was the long-term substitute who took Simpson's place as the teacher in the classroom where Valdez served as a teacher's associate. Bryson testified that Johnson was to be given authority over Valdez's classroom "the following school year," but in the interim, Johnson was only "the case manager for the students" in the classroom

and was providing support to Yochum to "help them get things situated." But even if Johnson had officially "taken over" Valdez's classroom, there is still no evidence that, in that position, Johnson could exercise supervisory authority over Valdez (such as the ability to hire, fire, or take other tangible employment actions) to give rise to individual liability as a supervisor. *See Haskenhoff*, 897 N.W.2d at 573; *see also Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850–51 (8th Cir. 2005) (distinguishing between supervisors and co-employees based on whether the harasser had the authority "to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties" (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004))).

Next, we conclude that *Rumsey* does not alter Johnson's individual liability for Valdez's hostile-environment-based ICRA claims. As a general matter, liability under the ICRA is not limited to employers. An individual can also be personally liable for employment discrimination, as evident from the ICRA's broad application to "any person." Iowa Code § 216.6(1); *see also Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa 1999) (holding that a supervisory employee could be subject to personal liability for unfair employment practices under Iowa Code section 216.6). But until recently, we had not had occasion to delineate the contours of ICRA liability beyond individuals holding supervisory positions. *See Rumsey*, 962 N.W.2d at 34 ("We have not addressed individual liability under ICRA beyond *Vivian* [*v. Madison*].").

In *Rumsey*, we recognized that "[w]hile the statutory language applies broadly to 'any person,' it also has limiting language." *Id. Rumsey* involved claims for failure to accommodate the plaintiff's hearing impairment and for retaliation that led to the plaintiff's termination. *Id.* at 33. In the context of those claims, we explained that the individual defendant "must have engaged in discriminatory conduct that resulted in an adverse employment action" or "engaged in retaliatory conduct . . . that materially and adversely injured or harmed the plaintiff." *Id.* at 34–35. The individual's supervisory authority "to alter the terms of a subordinate's employment" generally "is neither sufficient nor necessary to create liability." *Id.* at 35. Ultimately, *Rumsey* held that in order to be liable, an individual must both be personally involved in, and have the ability to effectuate, the particular challenged discriminatory action. *Id.* at 36.

*Rumsey* turned on our interpretation of the explicit language of the ICRA. *See Rumsey*, 962 N.W.2d at 34 ("We start with the language of the ICRA . . . ."). But "[t]he Iowa legislature . . . did not expressly include a hostile-work-environment provision in the ICRA." *Haskenhoff*, 897 N.W.2d at 571 n.2 (citing Iowa Code § 216.6(1)). Instead, "th[at] claim has been developed through our caselaw, beginning in 1990, based expressly on Title VII precedent." *Id.* Following Title VII caselaw, we relied on the "otherwise discriminate" language in Iowa Code section 216.6(1) to hold that the ICRA prohibits harassment that rises to the level of creating or maintaining a hostile work environment. *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 (Iowa 1990) (discussing the history of a hostile-work-environment claim). Where the legislature did not expressly provide

for a hostile-work-environment claim in the statute, we approach with caution Valdez's argument that our holding in *Rumsey* necessarily means the district court erred in failing to extend that case here.

Valdez's attempt to bring her case in line with *Rumsey* by simply substituting "hostile work environment" for "adverse employment action" cannot be squared with the analysis in that case. That the ICRA textually applies to "any person" cannot ignore that sections 216.6(1)(*a*) and 216.11 each create liability for specific employment actions. Iowa Code §§ 216.6(1)(*a*), .11; *see Rumsey*, 962 N.W.2d at 34 ("While the statutory language applies broadly to 'any person,' it also has limiting language."). *Rumsey* harmonized these aspects of the ICRA by recognizing that liability does not turn on a person's title within an organization, but liability is still grounded in the person's level of authority or control with respect to the specific employment decision being challenged. *See Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 706–07 (Iowa 2022) ("Our focus centers on whether [the defendant] was in a position to 'control' or 'effectuate' the" challenged action.). *Rumsey* shifted the focus of the inquiry away from the defendant's authority or control over the plaintiff (i.e., whether the defendant was the plaintiff's supervisor) and toward the defendant's authority or control over the challenged employment action.

So, although "[t]he 'any person' language is not limited by title," it is limited by a requisite level of authority "to effectuate" the adverse employment action. *Rumsey*, 962 N.W.2d at 35. And in the context of a hostile work environment, the necessary authority for liability must include the authority to correct or

prevent an abusive working environment. That a defendant's control must extend at least that far in order to be held liable is reflected in the framework underlying hostile-work-environment claims.

To prove a hostile work environment claim, the plaintiff must show she was subjected to unwelcome "harassment [that] affected a term, condition, or privilege of employment" on account of, as relevant here, her race. *Haskenhoff*, 897 N.W.2d at 571 (quoting *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006)). Harassment rises to the level of a hostile work environment "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Id.* (alteration and omission in original) (quoting *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 743 (Iowa 2003)). An employer can be liable under the ICRA for creating or maintaining a hostile work environment in two different ways: through its own direct negligence or through vicarious liability for a supervisor's actions. *See id.* at 575. Under the first theory, a necessary element of a direct negligence claim is the employer's failure "to take prompt and appropriate remedial action." *Id.* (quoting *Lynch*, 454 N.W.2d at 833). Under the second theory, although an employer can be vicariously liable for the actions of its supervisors through an agency analysis where the employer's liability is premised on the supervisor misusing a position of authority, *id.* at 573–75 (discussing federal cases distinguishing between liability premised on an employer's direct negligence and vicarious liability for a supervisor's actions), the

employer can avoid vicarious liability if it can show it "exercised reasonable care" to promptly correct or prevent the harassing behavior and the plaintiff failed to take advantage of the opportunities provided by the employer, *id.* at 573 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). Under either theory of liability, the focus is on allowing harassment to continue to the point of "creat[ing] an abusive working environment" rather than just the fact of harassment itself. *Id.* at 571 (quoting *Farmland Foods*, 672 N.W.2d at 743); *cf. Stricker v. Cessford Constr. Co.*, 179 F. Supp. 2d 987, 1015–16 (N.D. Iowa 2001) (predicting that "to the extent that the Iowa Supreme Court would require . . . a 'knew or should have known' element to establish [a supervisor's individual] liability . . . the Iowa Supreme Court would require the plaintiffs to prove that [the supervisor] knew or should have known of the harassment and failed to take prompt remedial action").

Nonsupervisory employees cannot "effectuate" a hostile working environment because they are not responsible for creating or maintaining the working environment and lack the authority to correct or prevent an abusive environment. This analysis accords with the justifications for allowing recovery for hostile-work-environment claims in the first place. As we explained in *McElroy v. State*, "[W]hen an employer creates a hostile work environment, employees are forced to 'run a gauntlet of sexual [or here, racial,] abuse in return for the privilege of being allowed to work and make a living . . . .'" 637 N.W.2d 488, 499 (Iowa 2001) (omission in original) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). This creates a situation where "the

employee must endure an unreasonably offensive environment or quit working." *Id.* at 499–500. But employees are not similarly held hostage where the hostile environment is being caused by someone without any authority to actually control the employee's working environment or their employment. Giving the employer an opportunity to correct the hostile actions of its employees is therefore a critical aspect of what makes a hostile work environment an unfair employment practice in the first place. *Cf.* Iowa Code § 216.6 (governing "[u]nfair employment practices"). Recognizing ICRA liability without that crucial element would turn the ICRA into a "general civility code for the American workplace," *Haskenhoff*, 897 N.W.2d at 588 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)), under which any co-employee engaging in harassing behavior could be held liable without the employer having been made aware of the behavior and given an opportunity to correct it in the first place.

Accordingly, the district court did not err in granting the directed verdict in favor of Johnson on Valdez's ICRA hostile-work-environment claims.

2. *Individual liability for wrongful discharge in violation of public policy.* We also reject Valdez's argument that the district court erred in directing out Johnson's liability on Valdez's common law claim of wrongful discharge in violation of public policy. In *Jasper v. H. Nizam, Inc.*, we held that individual "liability for [wrongful discharge] can extend to individual officers of a corporation who authorized or directed the discharge of an employee for reasons that contravene public policy." 764 N.W.2d 751, 776–77 (Iowa 2009). Our concern was preventing the "individual officers and employees authorized to make

discharge decisions from [avoiding] liability for the underlying tortious conduct in exercising that authority" by hiding behind the employer's corporate structure. *Id.* at 776. Valdez does not suggest that Johnson is an "officer of a corporation" or even that Johnson "authorized or directed" her discharge. Instead, she essentially asks us to extend *Jasper* beyond those facts, analogous to what we did in *Rumsey* in relation to *Vivian*. *See Rumsey*, 962 N.W.2d at 34 (recognizing that while *Vivian* taught that ICRA liability extended at least to supervisors, we had not addressed individual liability beyond that). Reasoning from *Jasper*'s statement that "[t]he tort of wrongful discharge does not impose liability for the discharge from employment, but the wrongful reasons motivating the discharge," 764 N.W.2d at 776, Valdez asserts individual liability against Johnson is proper here because "both the wrongful activity and wrongful motivations behind that activity (harassing behavior) were held by Johnson."[8]

---

[8]Neither Defendants nor Valdez address on appeal the issue of whether a wrongful discharge claim includes constructive discharge or whether it is limited to instances of actual discharge. *See, e.g.*, *Strehlow v. Marshalltown Cmty. Sch. Dist.*, 275 F. Supp. 3d 1006, 1013 (S.D. Iowa 2017) ("[T]he Iowa Supreme Court has never recognized a successful claim of constructive discharge in violation of common-law public policy."). The district court rejected the District's argument on this point in its summary judgment ruling, ultimately allowing the common law wrongful discharge claim to go to the jury as against the District. And the jury's verdict in the District's favor obviated a need for the District to challenge that ruling. Nor do Defendants challenge Valdez's reliance on the ICRA to supply the "clearly defined and well-recognized public policy" required to support the claim. *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa 2013) (quoting *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013)); *see also Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 434–35 (Iowa 2019) (per curiam) ("[W]hen the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary."); *Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 35 (Iowa 1991) (affirming dismissal of wrongful termination claim that was "indistinguishable from the civil rights claim" as preempted by the ICRA). For purposes of this appeal, we limit our analysis of Valdez's wrongful discharge claim to whether liability could extend to Johnson.

Valdez's broad formulation ignores the limitations we have imposed on the common law tort. Unlike the ICRA, which extends liability beyond employers to "any person," Iowa Code § 216.6(1)(*a*), the focus of the wrongful discharge tort is on the employment relationship. It places "limits [on] an *employer's* discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state." *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa 2013) (emphasis added) (quoting *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011)). Further, the claim is an exception to the employment-at-will doctrine, and as an exception, we narrowly construe its reach. *See id.* (describing the tort as a "narrow public-policy exception"); *Jasper*, 764 N.W.2d at 762 ("[T]he tort of wrongful discharge should exist in Iowa only as a narrow exception to the employment-at-will doctrine.").

At a minimum, liability for this tort still turns on the scope of the defendant's authority in the workplace. In fact, we have never even recognized the claim as against a mere supervisor who was not the employer's alter ego, let alone one who lacks discharge authority over the plaintiff. *See Carver-Kimm v. Reynolds*, 992 N.W.2d 591, 604, 2023 WL 4140067, at *10 (Iowa June 23, 2023) ("In the thirty-five years since we first recognized the tort in *Springer v. Weeks & Leo Co.*, 429 N.W.2d [558,] 560 [(Iowa 1988) (en banc)], we have never extended it to include liability to those without authority to discharge the plaintiff employee. We decline the invitation to do so today.").

*Jasper*'s broad statements about the principles supporting liability for wrongful discharge cannot be divorced from the parameters underlying the tort.

*See Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303 (Iowa 2013) ("We cautiously identify policies to support an action for wrongful discharge under the public-policy exception . . . [to avoid] 'unwittingly transform[ing] the public policy exception into a "good faith and fair dealing" exception, a standard we have repeatedly rejected.' " (quoting *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 283 (Iowa 2000) (en banc))). They certainly do not support extending its reach beyond those with authority to discharge an employee, constructively or otherwise. We need not decide how broadly individual liability for a wrongful discharge claim may extend. It is enough to recognize that it does not extend far enough to hold Johnson liable in this case. The district court did not err in directing a verdict in Johnson's favor.

**C. Evidentiary Rulings.** Valdez also contends the district court made three errors in ruling on evidentiary issues. "This court 'generally review[s] evidentiary rulings for abuse of discretion.' " *State v. Rodriquez,* 636 N.W.2d 234, 239 (Iowa 2001) (alteration in original) (quoting *Williams v. Hedican,* 561 N.W.2d 817, 822 (Iowa 1997)). "However, we review hearsay rulings for correction of errors at law." *McElroy,* 637 N.W.2d at 493; *see also State v. Plain,* 898 N.W.2d 801, 810 (Iowa 2017).

"[R]eversal is required for the improper admission or exclusion of evidence only if the exclusion affected a substantial right of a party. In a case of nonconstitutional error, 'we presume prejudice—that is, a [party's] substantial right [was] affected—and reverse unless the record affirmatively establishes otherwise.' " *State v. Buelow,* 951 N.W.2d 879, 890 (Iowa 2020) (citation omitted)

(quoting *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004)); *see also* Iowa R. Evid. 5.103(*a*); *McGrew v. Otoadese*, 969 N.W.2d 311, 325 (Iowa 2022); *Eisenhauer ex rel. T.D. v. Henry Cnty. Health Cntr.*, 935 N.W.2d 1, 19 (Iowa 2019).

1. *Exhibits B-11 and B-12.* Exhibits B-11 and B-12 were part of the correspondence between Valdez's attorney and the District before Valdez quit her job. Valdez's attorney sent a letter on May 28, 2019, which outlined Valdez's complaints, asserted that the District had provided "[n]o apparent solution" to the alleged harassment and retaliation, and threatened litigation if a response was not given within a set time. Valdez introduced this letter at trial as Exhibit B-10. Valdez's attorney sent a second letter to the District on June 17 (Exhibit B-11), which highlighted Valdez's unsuccessful previous request to transfer away from Johnson to another position within the District, to show that Valdez did "not believe that the District c[ould] protect her from further harassment and retaliation." It ended with an invitation to "negotiat[e] between the lawyers or engag[e] in a mediation." On June 25, the District sent a response (Exhibit B-12) informing Valdez that it had investigated her complaints and could "see no legal basis upon which it owe[d] [her] payment," that it "welcome[d] the opportunity to work with her" on a transfer away from Johnson, and that it would "vigorously defend itself" if she chose "to pursue legal action." The June letters were admitted at trial as Exhibits B-11 and B-12 over Valdez's objection. The district court required the parties to redact the discussion of monetary settlements but allowed these particular statements related to the parties' openness to discussing

alternatives to litigation and the offer to transfer Valdez to another position within the District to remain. The district court explained:

> Plaintiff sought admission of the first letter from her attorney [(Exhibit B-10)]. The other letters [(Exhibits B-11 and B-12)] may never have come into evidence but for her desire to admit the first letter. The other two letters were relevant for other purposes, specifically plaintiff's constructive discharge claim. She claimed that she was denied transfers outside the building, which she attributed to discrimination, harassment, and retaliation by defendants. This was referenced in exhibit B-11. [The District] specifically offered to work with her on a transfer in exhibit B-12. As a result, the letters were offered for another purpose, which is allowed by Iowa R. Evid. 5.408(b).

Valdez contends that, even as redacted, Exhibits B-11 and B-12 should have been excluded as settlement offers. Under Iowa Rule of Evidence 5.408, "statement[s] made during compromise negotiations about [a] claim" are inadmissible "to prove the validity or amount of a disputed claim" but are admissible "for another purpose." Iowa R. Evid. 5.408(*a*)(2), (*b*); *see also Hyler v. Garner*, 548 N.W.2d 864, 869 (Iowa 1996) ("Rule [5.]408 requires the exclusion of evidence of settlement negotiations offered solely to prove or disprove liability or damages.").

Valdez argues that admitting the settlement evidence to rebut the claim that she had been constructively discharged is indistinguishable from rule 5.408's impermissible use of settlement discussions to disprove the validity of her disputed claim. *See* Iowa R. Evid. 5.408(*a*)(2). To the extent Defendants used the letters to challenge the elements of Valdez's prima facie constructive discharge claim, they could be construed to be, "in a sense, offered to demonstrate the 'invalidity' of [Valdez]'s claim"; if Defendants successfully rebut

the claim, they effectively "invalidate" it. *PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109, 114 (2d Cir. 2008) (rejecting argument that evidence supporting a defense of estoppel by acquiescence was offered to prove the invalidity of the plaintiff's claim such as to fall within Rule 408's prohibition even though, if successful, the estoppel defense would defeat the plaintiff's claim). But "[t]he problem with [Valdez]'s clever argument is that it would deprive [r]ule [5.]408's exception of all meaning." *Id.* If the concept of "validity" is viewed broadly enough, all evidence could be said to be offered for the purpose of proving or disproving the validity of a claim. If that were the case, "no evidence [would] fall[] within the category whose exclusion is 'not require[d]' because it is 'offered for another purpose' "; the rule would swallow the exception. *Id.* (third alteration in original) (quoting Fed. R. Evid. 408).

We have long recognized that "[t]he offer of settlement or compromise exclusionary rule is designed to exclude this evidence only when it is tendered as an admission of weakness of the other party's claim or defense, not when it is tendered to prove a fact other than liability." *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 215 (Iowa 1984) (alteration in original) (quoting *Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 921 (Iowa 1979)). In *Miller v. Component Homes*, the plaintiff was required to show his employer intentionally failed to pay him as part of his Chapter 91A wage collection claim. *Id.* at 215–16. We held that statements in a letter "demanding the $13,000 in commissions[, which] tended to show that Component Homes had not inadvertently failed to pay him," were properly admitted because they "had probative value quite aside from any

consideration of admissions," *id.* at 216—namely, supporting a specific element of the plaintiff's claim. *See also Hyler*, 548 N.W.2d at 869 (rejecting a rule 5.408 challenge where the proffered evidence was relevant to proving elements of the plaintiffs' rescission and attorney's fee claims).

Here, the district court admitted Exhibits B-11 and B-12 because they were relevant to rebutting the element of Valdez's constructive discharge claim requiring her to show the District refused to remedy the harassment she complained about from Johnson. *See Van Meter Indus. v. Mason City Hum. Rts. Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004) ("Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (quoting *First Jud. Dist. Dep't of Corr. Servs. v. Iowa C.R. Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982))); *Haskenhoff*, 897 N.W.2d at 592–93 ("The test for [intolerable working conditions in a] constructive discharge [claim] is objective, evaluating whether a *reasonable person* in the employee's position would have been compelled to resign and whether an employee *reasonably believed* there was no possibility that an employer would respond fairly."). Both letters rebutted her claim by documenting the District's contemporaneous offer to work with her on a transfer away from Johnson. Allowing the evidence for this purpose was particularly apt in this case where, as the district court reasoned, Valdez opened the door to Exhibits B-11 and B-12 when she proffered the first letter, Exhibit B-10. Valdez used Exhibit B-10 as evidence that the District failed to correct the harassing behavior; the

District was entitled to introduce Exhibits B-11 and B-12 to show its efforts to the contrary.

Valdez counters that even if rebutting the elements of her constructive discharge claim was a permissible use under rule 5.408, Defendants' "true purpose" for introducing these exhibits was "to accuse [her] of a 'set up', in essence, a sham lawsuit." If truly used for that purpose, the exhibits might fall within rule 5.408's ambit to the extent that the jury is asked to infer that Valdez knew her claim was not genuine. *See Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 966–67 (8th Cir. 2011) (recognizing that "[i]n certain circumstances, evidence of a compromise offer may be admitted to show a party's lack of good faith" but holding that the settlement evidence offered in the case at issue was inadmissible because the issue of the defendant's "bad faith is inseparable from the issue of liability"); 23 Charles Alan Wright & Victor Gold, *Federal Practice and Procedure: Evidence* § 5303, at 197–98 (2d ed. 2018) [hereinafter Wright & Gold] ("[W]here, in an action for abuse of process, the present plaintiff uses evidence of an offer by the present defendant to settle the prior action for a pittance to show that the defendant brought that prior action in bad faith, evidence of the settlement offer is being offered to permit an inference as to the offeror's belief in the invalidity of her claim."). But where there was also a permissible use for the exhibits, parsing the permissible from the impermissible falls to the district court's discretion. *See Gail v. Clark*, 410 N.W.2d 662, 672 (Iowa 1987) ("[T]rial judge[s] should weigh [the] need for [settlement] evidence against the potentiality of discouraging future settlement negotiations."); *see also Hamilton v. Mercantile Bank of Cedar Rapids*,

621 N.W.2d 401, 408 (Iowa 2001) (en banc) ("[The] decision whether to admit proof of [a] settlement offer on alternate ground[s] [is] 'committed to the discretion of the trial court.' " (quoting *Gail*, 410 N.W.2d at 671)). There may be some instances where the proffered purpose for a piece of evidence, though distinct, is so intertwined with rule 5.408's impermissible purposes that it requires wholesale exclusion. *See Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (rejecting proffered use of settlement evidence to prove compliance with the statute of frauds in a breach of contract case "[s]ince the two questions [of statute of frauds compliance and breach of contract] were so closely intertwined"); *Gail*, 410 N.W.2d at 672 ("[B]ecause the evidence of the amount of settlement would have presented a danger of substantial prejudice to the Gails, we hold that the district court did not abuse its discretion in excluding evidence of Clark's settlement agreement with the Gails."); 2 Robert P. Mosteller et al., *McCormick on Evidence* § 266 n.17, at 355 (8th ed. 2020) [hereinafter *McCormick*] (noting that in some situations a proffered alternative use for settlement evidence "may be effectively too closely related [to the rule's prohibited purpose] to permit admission either under the direct application of Rule 408 or in combination with the prejudicial impact of the evidence under Rule 403"). But that decision, too, is for the district court to make in the first instance. *See PRL USA Holdings, Inc.*, 520 F.3d at 116 ("The exception says only that '[t]his rule . . . *does not require exclusion* when the evidence is offered for another purpose,' Fed.[ ]R.[ ]Evid. 408 (2005) (emphasis added), leaving the court wide discretion whether to admit or exclude." (first alteration

and omission in original)); *McCormick* § 266, at 356 ("As in other situations where evidence is admissible for one purpose but not for another, the probative value for the proper purpose must be weighed against likelihood of improper use, with due regard to the probable efficacy of a limiting instruction.").

On our review of the record, we do not believe the district court abused its discretion. Defendants' argument that Exhibits B-11 and B-12 showed Valdez's constructive discharge claim was merely a "set up" was made primarily in pretrial filings, including in resistance to Valdez's motion in limine. But at the trial itself, Defendants ostensibly used the letters for the purpose for which they were admitted—to show that Defendants "offer[ed] [Valdez] exactly what she wanted: [e]mployment with any other building or supervisor." Although defense counsel did make the "set up" accusation in closing arguments, that comment was made in reference to Exhibit B-10—the letter *Valdez* introduced at trial.[9]

The district court did not abuse its discretion in admitting Exhibits B-11 and B-12.

2. *Exhibit 6.* Valdez next challenges the district court's exclusion of Exhibit 6, which contained notes pertaining to the District's investigation into Valdez's complaints, including what appear to be notes from interviews of Valdez, Johnson, and Bryson. The parties and the court agreed that the notes were likely created by Jesse Johnston—the HR employee tasked with investigating Valdez's

---

[9]That said, we caution that, in another context, an accusation similar to Defendants' "set up" accusation here could be construed as an impermissible attack on the validity of an opposing party's claim for purposes of Iowa Rule of Evidence 5.408. *See* Wright & Gold § 5303, at 193–94, 197–98 ("[E]vidence that plaintiff offered to settle is inadmissible to show plaintiff had doubts about the validity of her case.").

complaints—but the notes themselves do not identify Johnston as the author, nor do they indicate clearly when the interviews they apparently document took place. Because Johnston passed away before trial, she could not be called to clarify these points.

The district court sustained Defendants' objection to the exhibit as inadmissible hearsay. Although Valdez argued that the exhibit was being offered for the nonhearsay purpose of showing Defendants' knowledge of Johnson's actions and Valdez's complaints to support Valdez's retaliation claim, the district court did not pass on the argument. Instead, the court emphasized that its main concern with Exhibit 6 was its reliability.

The district court's analysis may have too quickly overlooked Valdez's proposed nonhearsay uses for Exhibit 6. Hearsay is defined as a statement, not made at the trial or hearing at which it is being offered as evidence, offered to prove the truth of the matter asserted. Iowa R. Evid. 5.801(*c*). That the notes might not have been reliable does not affect whether they were being offered for the truth of the matters stated in the notes or for a different, nonhearsay, purpose. To the extent the district court sustained Defendants' hearsay objection without considering whether it was in fact hearsay, i.e., offered for the truth of the matters asserted, the district court erred.

Nevertheless, we may uphold the court's exclusion of Exhibit 6 if it "could be held inadmissible on any theory." *Holmes v. Pomeroy*, 959 N.W.2d 387, 391 (Iowa 2021). The district court's reasoning and conclusion supports exclusion under Iowa Rule of Evidence 5.403. Although neither the parties nor the district

court explicitly contemplated rule 5.403 when discussing Exhibit 6, the district court's focus on Exhibit 6's reliability is more properly taken into account under that rule. *Cf. State v. Liggins*, 978 N.W.2d 406, 421–31 (Iowa 2022) (considering, and rejecting, defendant's arguments that certain evidence was unreliable and therefore inadmissible under rule 5.403 where the evidence "was not so inherently unreliable that the district court abused its discretion by declining to exclude it under" rule 5.403).

Rule 5.403 allows courts to exclude relevant evidence where that evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. Reliability is not directly relevant to this inquiry but can indirectly affect the enumerated factors. For instance, the probative value of evidence may be substantially diminished because of its unreliable nature. *See State v. Cromer*, 765 N.W.2d 1, 8–9 (Iowa 2009) (reasoning that because "[c]oercion diminishes the reliability of an admission," the coercive atmosphere in which the statements at issue were made "tended to make the statements less probative of the ultimate issue," and they therefore should not have been admitted); *see also United States v. Tsarnaev*, 142 S. Ct. 1024, 1037–39 (2022) (upholding district court's exclusion of evidence under statutory rule similar to rule 5.403 given that, where no one could elaborate on the context of the evidence to "confirm or verify the relevant facts, since all of the parties involved were dead," it was "without any probative value"). At the same time, unreliable evidence may risk introducing unfair

prejudice or confusion by creating "mini-trials" surrounding the contested evidence. *See Tsarnaev*, 142 S. Ct. at 1039 (noting the "bare inclusion" of unreliable evidence would have "risked producing a confusing mini-trial").

As Defendants pointed out in challenging admission of the notes: without Johnston's help in interpreting Exhibit 6 (assuming the notes were in fact Johnston's), jurors would have been left to their own devices to, for example, "decode who . . . [Johnston] was speaking to" in relation to specific notes or whether the notes captured direct statements or merely Johnston's impressions of interviews. Embarking down that path may have protracted the trial while the parties offered additional evidence to establish the declarant of specific statements. And if, despite the potentially lengthy detour, jurors nevertheless reached the wrong conclusion regarding who said what, they could have improperly attributed statements to Johnson or Bryson. There were therefore legitimate concerns over Exhibit 6's probative value and its potential to confuse jurors and cause unfair prejudice to Defendants.

Further, as the district court noted, much of what Valdez wanted to establish through the exhibit was accomplished by other means: Valdez's own statements and complaints were admitted along with Johnston's final report on her investigation. Valdez's counsel examined Johnson and Bryson extensively on their contemporaneous emails and actions to establish that they knew about Valdez's complaints prior to June. At best, Exhibit 6 would have marginally furthered the point Valdez sought to establish, but any marginal benefit to Valdez's case was not such as to make Exhibit 6's exclusion prejudicial. *See*

*Jenkins v. S. Farm Bureau Cas.*, 125 F. App'x 749, 752 (8th Cir. 2005) (per curiam) (rejecting argument that "even though [Jenkins] was able to testify about the contents of the policies-and-procedures manual at trial[,] he was prejudiced by the exclusion of the manual"); *see also SEC v. Shanahan*, 646 F.3d 536, 548 (8th Cir. 2011) ("[A]ny abuse of discretion [in excluding cumulative evidence] was not prejudicial.").

We therefore hold that the district court did not abuse its discretion in excluding Exhibit 6 because its probative value is substantially outweighed by dangers of unfair prejudice, confusion, and presentation of cumulative evidence. *See* Iowa R. Evid. 5.403. Further, any error was not prejudicial.

3. *Pinching incident.* Finally, Valdez contests the district court's decision to exclude evidence of an incident in which Johnson allegedly pinched a Hispanic student. In September or October of 2019 (at least two months after Valdez left her position with the district), a parent complained to Principal Maxwell that Johnson pinched her son—a special needs student Valdez asserts she "had observed Johnson mistreat [prior to this incident] and [who] was also part of the basis for [Valdez's] complaints to [District] administration about Johnson." Accordingly, Valdez sought to admit evidence of the pinching incident to buttress her allegations of Johnson's abusive behavior toward students (especially students of color), of the District's failure to take corrective actions on those allegations, and of Johnson's racial animus.

The district court excluded evidence of the pinching incident, reasoning:

[T]he incident involving the pinching of the student was not revealed until a complaint was filed in the fall of 2019, well after [Valdez]

resigned. There is no evidence that [Valdez] or defendants were aware of the incident until the complaint was filed. It may show racial animus, but it is disconnected from the other events. Defendants' motion [to exclude the evidence] is granted on this point.

In ruling on Valdez's new trial motion, the district court summarily reaffirmed its prior ruling without additional analysis.

Whether it is referred to as "prior acts" evidence, *see Hamer v. Iowa C.R. Comm'n*, 472 N.W.2d 259, 262–63 (Iowa 1991), "similar acts" evidence, *see Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 652–53 (Iowa 1984), or "me too" evidence (as the district court here characterized it by reference to *Salami v. Von Maur, Inc.*, No. 12–0639, 2013 WL 3864537, at *7–8 (Iowa Ct. App. July 24, 2013)), the district court did not abuse its discretion in excluding this evidence. As a general matter, "[e]vidence of a discriminatory atmosphere is relevant in considering a discrimination claim, and it 'is not rendered irrelevant by its failure to coincide precisely with the particular actors or time frame involved in the specific events that generated a claim of discriminatory treatment.'" *Hamer*, 472 N.W.2d at 262 (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387–88 (2008) (disavowing per se rule of exclusion for similar acts evidence in age discrimination case that would require such evidence to involve the same supervisor). Nonetheless, the relevancy of such evidence can be affected by "many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case," *Mendelsohn*, 552 U.S. at 388, and whether it is "too remote or collateral [to the

plaintiff's circumstances] such as to lead the jury astray," *Lund v. McEnerney*, 495 N.W.2d 730, 734 (Iowa 1993). Relevant factors might include: "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." *Elion v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008).

Whatever particular factors a court uses to guide its analysis, "[t]he admission of testimony regarding similar acts is 'a question of trial court discretion.'" *Kunkle*, 347 N.W.2d at 653 (quoting *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 921 (Iowa 1978) (en banc)). Here, the court weighed the evidence and concluded that the pinching incident was too "disconnected from the other events" involved in Valdez's case. Valdez disagrees but does not show that the district court's reasoning is untenable. *Cf. State v. Trane*, 984 N.W.2d 429, 433–34 (Iowa 2023) ("[A] court abuses its discretion when its decision is based on untenable grounds or it has acted unreasonably." (quoting *State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005))). As such, we hold that the district court did not abuse its discretion in excluding this evidence.

**III. Conclusion.**

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**